IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

TRACY H. J.,[1]
     Plaintiff,

          v.                              Civil No. 3:20-cv-00564 (MHL)

KILOLO KIJAKAZI,[2]
Commissioner of Social Security,
     Defendant.


**REPORT AND RECOMMENDATION**

This is an action seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits under the Social Security Act (the "Act").

Plaintiff, forty-nine years old at the time of her benefits application, has a college education and last worked as a paralegal. (R. at 312.) Plaintiff suffers from degenerative disk disease of the lumbar spine, degenerative joint disease of the right shoulder, torn rotator cuff on the right shoulder, left leg pain, and depression. (R. at 92-99.)

On June 25, 2019, an Administrative Law Judge ("ALJ") found Plaintiff not disabled under the Act. (R. at 39.) After exhausting her administrative remedies, Plaintiff now seeks review of the ALJ's decision. Plaintiff argues that the ALJ erred by: (1) failing to address the totality of the medical record when determining her residual functional capacity; (2) failing to evaluate her

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.
[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Acting Commissioner Kijakazi should be substituted as the defendant in this suit.

degenerative disc disease of the lumbar spine with symptoms of sciatica in accordance with Acquiescence Ruling 15-1(4); (3) failing to give further consideration to her subjective complaints of pain; and (4) improperly assessing the opinion of Dr. Geoffrey Higgs ("Dr. Higgs") about her right shoulder and weight restrictions; (Mem. Supp. Pl.'s Mot. Summ. J., at 2, ECF No. 27-1 ("Pl.'s Mem.").)

This matter comes before the Court pursuant to 28 U.S.C. § 636(c)(1) on cross motions for summary judgment,[3] which are now ripe for review.[4] Having reviewed the parties' submissions and the entire record in this case, and for the reasons set forth below, the Court RECOMMENDS that the Memorandum in Support of Plaintiff's Motion for Summary Judgment (ECF No. 27) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 28) be GRANTED; and the final decision of the Commissioner be AFFIRMED.

## I.  PROCEDURAL HISTORY

On August 10, 2015, Plaintiff filed an application for disability insurance benefits alleging disability beginning October 1, 2014. (R. at 278-79.) The Social Security Administration initially denied this claim on November 25, 2015, (R. at 162) and again upon reconsideration February 11, 2016. (R. at 168.) At Plaintiff's written request, the ALJ held a hearing on August 3, 2017, at

_____

[3] On April 13, 2021, Plaintiff filed a Motion and Brief in support for Extension of Time to File Motion and Memorandum in Support for Summary Judgment. (ECF No. 27.)  Plaintiff did not file a Motion for Summary Judgment. For purposes of this Report and Recommendation, the Court will treat the Memorandum in Support of Plaintiff's Motion for Summary Judgment as Plaintiff's motion and supporting memorandum for summary judgment.

[4] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

which a vocational expert and Plaintiff testified. (R. at 50-118, 171.) On January 19, 2018, the ALJ issued a written opinion holding that Plaintiff was not disabled from the alleged onset date through the date of the ALJ's decision. (R. at 151.) Plaintiff petitioned the Social Security Administration Appeals Council to review the decision. (R. at 229.) On October 26, 2018, the Appeals Council granted Plaintiff's review, vacated the hearing decision, and remanded the case to an ALJ. (R. at 158.) In its remand order, the Appeals Council instructed the ALJ to: (1) consider and discuss the weight given to the opinion of Dr. Higgs; (2) re-evaluate Plaintiff's residual functional capacity to determine the extent of Plaintiff's right upper extremity's limitations and provide specific references to evidence of record in support of the assessed limitations; and (3) evaluate Plaintiff's degenerative disc disease of the lumbar spine with symptoms of sciatica and Listing 1.04A in accordance with Acquiescence Ruling 15-1(4). (R. at 158-59.) It also advised the ALJ to obtain evidence, "if necessary" from a medical expert related to "whether the claimant's impairment meets or equals the severity of an impairment listed in Appendix 1, Subpart P, Regulations No. 4 (20 CFR 3030.1513a(b0(2))." (R. at 159.)

Following remand by the Appeals Council, the ALJ held a second hearing on April 29, 2019, at which Plaintiff and a different vocational expert testified. (R. at 85, 89.) On June 25, 2019, the ALJ issued a written opinion holding that Plaintiff was not disabled under the Act. (R. at 27-39, 261-63.) Plaintiff appealed the ALJ's decision on July 8, 2019. (R. at 251.) On November 19, 2019, Plaintiff submitted to the Appeals Council additional records from various medical providers as well as an email from her employer documenting her absenteeism and excessive "smoke breaks." (R. at 6-23.) She petitioned the Appeals Council to consider these documents in its review of the ALJ's June 25, 2019 decision. (R. at 7.)

3

On June 23, 2020, the Social Security Administration Appeals Council denied her request for review, rendering the ALJ's decision as the final decision of the Commissioner. (R. at 1-4.) In its response, the Appeals Council explained that most of the additional evidence Plaintiff submitted following the ALJ's decision was duplicative of evidence already contained in the record, and that the other remaining records did not "show a reasonable probability that it would change the outcome of the ALJ's decision." (R. at 2.) Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

## II.  STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the Social Security Administration's disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d

4

650, 653 (4th Cir. 2005)).

In considering the decision of the Commissioner based on the record as a whole, the court must take into account "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 476. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

Social Security Administration regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 404.1520(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. § 404.1520(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. § 404.1520(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. § 404.1520(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity, accounting for the most the claimant can do despite her physical and mental limitations. § 404.1545(a).

At step four, the ALJ assesses whether the claimant can perform her past work given her residual functional capacity. § 404.1520(a)(4)(iv). The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock*, 2012 U.S. App. LEXIS 128, at *3 (citation omitted). If such work can be performed, then benefits will not be

5

awarded, and the analysis ends at step four.  §§ 416.920(e), 404.1520(e). However, if the claimant cannot perform her past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant is capable of performing other work that is available in the national economy. § 404.1520(a)(4)(v).

### III.  THE ALJ'S DECISION

Plaintiff appeared and was represented by counsel at her hearing on August 3, 2017. (R. at 52.) However, at the hearing on April 29, 2019, Plaintiff chose to proceed without counsel. (R. at 89.) A vocational expert testified at both hearings. (R. at 85-118, 52-82.) On June 25, 2019, the ALJ issued a written opinion, denying Plaintiff's claims and concluding that Plaintiff did not qualify as disabled under the Act. (R. at 27-39.) The ALJ followed the five-step evaluation process established by the Act in analyzing Plaintiff's disability claim. (R. at 29-38.)

At step one, the ALJ determined that Plaintiff had engaged in substantial gainful activity from June 18, 2018 through the date of the ALJ's opinion.[5] (R. at 30.) Although Plaintiff had engaged in substantial gainful activity during this time, the ALJ noted a continuous twelve-month period where Plaintiff did not engage in substantial gainful activity. (R. at 31.) The ALJ's findings address the period during which Plaintiff did not engage in substantial gainful activity. (R. at 31.) At step two, the ALJ determined that Plaintiff suffered from the following severe impairments:

_____

[5] "Substantial gainful activity" is work that is both substantial and gainful as defined by the Agency in the C.F.R.  Substantial work activity is work activity that involves doing significant physical or mental activities.  Work may be substantial even if it is done on a part-time basis or if an individual does less, gets paid less, or has less responsibility than when the individual worked before. 20 C.F.R. § 404.1572(a).  Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized."  20 C.F.R. § 404.1572(b).  Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities.  20 C.F.R. § 404.1572(c).

"degenerative joint disease and rotator cuff tear of the right shoulder, status post-surgery; enthesopathy of the right elbow; degenerative joint disease of the left hip, status post iliotibial band release; and degenerative disc disease of the lumbar spine." (R. at 31.) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 33.)

After step three, the ALJ considered Plaintiff's residual functional capacity.[6] (R. at 33-38.) The ALJ found that Plaintiff had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), with the exception that she can stand and walk for four hours in an eight-hour day. (R. at 33-34.) She can lift and carry ten pounds occasionally and five pounds frequently with the right, dominant, upper extremity, but she cannot perform overhead work. (R. at 34.) She must be allowed to change positions for one minute in place every hour and requires a ten-minute break every two hours. (R. at 34.) She will be off task nine percent of the time and miss ten days of work per year. (R. at 34.) She is capable of crawling, bending, stooping, and climbing ramps and stairs occasionally, and can frequently perform tasks which require fine and gross dexterity. (R. at 34.)

-----

[6] "Residual functional capacity" is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing residual functional capacity, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, eight hours a day, five days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

Based on this determination, the ALJ considered at step four of the analysis whether Plaintiff could perform her past relevant work as a paralegal, at least in the manner in which such work is generally performed.[7] (R. at 38.) The conclusion was based on the testimony of Plaintiff and a vocational expert during the hearing, and the ALJ's review of the record. (R. at 38.) The ALJ found that Plaintiff could perform her past work as a paralegal because that job does not require work-related activities that are incompatible with her residual functional capacity. (R. at 38.) The ALJ declined to proceed to step five because that part of the analysis is not required if, at step four, the ALJ determines that Plaintiff can perform past relevant work. 20 C.F.R. §§ 416.920(e), 404.1520(e). Accordingly, the ALJ concluded that Plaintiff did not qualify as disabled under the Act. (R. at 38-39.)

## IV. ANALYSIS

Plaintiff challenges the ALJ's finding of "not disabled," arguing that the ALJ did not apply the correct legal standards when forming his conclusion. (Pl.'s Mem. at 2). Specifically, Plaintiff contends that the ALJ: (1) failed to account for Plaintiff's degenerative disc disease of the lumbar spine, resulting sciatica, and right shoulder limitations when evaluating her residual functional capacity; (2) did not properly evaluate Plaintiff's subjective complaints; and (3) failed to account for Dr. Higgs's opinion regarding the use of her right shoulder, range of motion, reach, strength, and weight restrictions when determining her residual functional capacity. (Pl.'s Mem. at 2-4; Pl.'s Resp. Opp. Def.'s Mot. Summ. J. at 11, ECF No. 30 ("Pl.'s Resp. Opp.")).

---

[7] "Past relevant work" is defined as substantial gainful activity in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved.  20 C.F.R. §§ 416.965(a), 404.1565(a).

**A.  The ALJ Properly Assessed Plaintiff's Residual Functional Capacity by Considering the Totality of the Evidence.**

Plaintiff contends that the ALJ erred by: (1) failing to consider the entirety of the medical record when determining her residual functional capacity; and (2) by considering the opinions of two medical experts who did not personally treat her. (Pl.'s Mem. at 3-4). Defendant responds that the ALJ correctly considered and evaluated the entirety of the medical opinion evidence as part of his residual functional capacity assessment. (Def.'s Mem. at 27).

The ALJ has a duty to "explore all relevant facts and inquire into the issues necessary for adequate development of the record[] and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (citing *Walker v. Harris*, 642 F.2d 712, 714 (4th Cir. 1981) and *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980)).

The residual functional capacity assessment "must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996). The ALJ must also evaluate consultative opinions but is not required to award them any heightened value. 20 C.F.R. §§ 404.1527(d), 416.927(d).

The ALJ discussed and analyzed the evidence, including Plaintiff's complaints of pain and other symptoms, and cited to medical records and evaluations to support his conclusions. The ALJ fully explored the facts and inquired into the relevant issues in order to adequately develop the record, asking Plaintiff about her education and work history (R. at 100-102 -113), medical conditions and the limitations caused by those conditions (R. at 93-100, 104-109), and her daily activities (R. at 102, 105.) He also discussed with Plaintiff her past work history. (R. at 101-102).

9

The ALJ then proceeded to ask the vocational expert questions and converted several of Plaintiff's comments concerning her limitations into further questions to the vocational expert. (R. 109-113.)

The hearing itself lasted well over an hour providing more than enough time for the development of Plaintiff's testimony. (R. at 85, 118.) At the beginning of the hearing, the ALJ informed plaintiff of her right to representation and how a representative could assist her. (88-89.) He also checked that Plaintiff wanted to continue with the hearing after providing her with the opportunity to postpone the hearing in order to obtain representation. (R. at 89.) The ALJ clarified the exhibits before him and confirmed with Plaintiff that it was incomplete at that time. (R. at 86-87.) He offered to allow Plaintiff to make copies of the unsubmitted records and to submit the additional records despite the requirement that Plaintiff submit all records five days before the hearing. (R. at 86-87, 90.) Plaintiff's hearing was thorough, covering all relevant matters pertaining to the issues at hand, and ensuring an opportunity for adequate development of the record.

After reviewing the record, the ALJ determined that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b), except that she can stand and walk for four hours in an eight-hour day. (R. at 33-34.) He found that she cannot go up or down ladders, ropes, or scaffolds, but can crawl, crouch, bend, stoop, and climb ramps and stairs occasionally.  (R. at 34.) Plaintiff cannot perform overhead work with the right upper extremity, nor can she reach beyond shoulder height for straight and lateral raising. (R. at 34.) She can frequently perform tasks requiring fine and gross dexterity but will be off task nine percent of the time and miss ten days of work per year. (R. at 34.) She requires a ten-minute break every two hours and must be allowed to change positions for one minute in place every hour. (R. at 34.)

1.  **The ALJ Adequately Addressed Plaintiff's Degenerative Disc Disease and Resulting Sciatica.**

Plaintiff argues that the ALJ failed to: (1) review the medical evidence pertaining to "her collapsed disc and resulting sciatica"; and (2) address these impairments in his decision to deny her claim. (Pl.'s Mem. at 4). (emphasis in original.) Therefore, Plaintiff contends that the ALJ did not comply with the Appeals Council's directive to "evaluate Plaintiff's degenerative disc disease of the lumbar spine with symptoms of sciatica and Listing 1.04A in accordance with Acquiescence Ruling 15-1(4)." (R. at 159.) Defendant responds that the ALJ appropriately addressed this particular Listing in his decision and explained why the evidence did not support a finding that Plaintiff met or equaled a listed impairment. (R. at 33.) (Def.'s Mem. at 24).

Listing 1.04A is the regulation that "identif[ies] disorders of the spine that merit a conclusive presumption of disability and an award of benefits." *Radford v. Colvin*, 734 F.3d 288, 290 (4th Cir. 2013). According to the regulation, an individual must have a "[d]isorder the spine . . . resulting in compromise of a nerve root . . . or the spinal cord." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04A; *Taylor v. Colvin*, 2016 U.S. Dist. LEXIS 73679, 2016 WL 3190637, at *6. In addition, Plaintiff must show evidence of:

> (1) nerve root compression characterized by neuro-anatomic distribution of pain; (2) limitation of motion of the spine; (3) motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back; and (4) positive straight-leg raising test (sitting and supine).

*Id*. "The burden of proof is on [Plaintiff] to show that [she] meets all of the specified medical criteria." *Hepding v. Comm'r, Soc. Sec. Admin.*, No. ADC-17-3697, 2018 U.S. Dist. LEXIS 199895, 2018 WL 6172497, at *6 (D. Md. Nov. 11, 2018) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990)). In addition to showing the presence of each

symptom, Plaintiff must show that she "has suffered or can be expected to suffer from nerve root compression continuously for at least 12 months." *Radford*, 734 F.3d at 294. A claimant need not show the symptoms were present "simultaneously," in close proximity to one another, or even uninterrupted; rather, they may be intermittent and a claimant may "prove a chronic condition by showing that he experienced the symptoms 'over a period of time,' as evidenced by 'a record of ongoing management and evaluation.'" *Id*. (citations omitted).

An ALJ is required to "explicitly identify and discuss relevant listings of impairments where there is 'ample evidence in the record to support a determination' that an impairment meets or medically equals a listing." *Kelly v. Astrue*, No. 5:08-cv-289-FL, 2009 U.S. Dist. LEXIS 40154, 2009 WL 1346241, at *5 (E.D.N.C. May 12, 2009) (quoting *Ketcher v. Apfel*, 68 F.Supp.2d 629, 645 (D. Md.1999)). The Fourth Circuit has previously found error where the "ALJ failed to identify the relevant listings and to explicitly compare the claimant's symptoms to the requirements of the listed impairments." *Johnson v. Astrue*, No. 5:08-cv-515-FL, 2009 U.S. Dist. LEXIS 104465, 2009 WL 3648551, at *2 (E.D.N.C. Nov. 3, 2009) (citing *Cook v. Heckler*, 783 F.2d 1168 (4th Cir. 1986)). However, "[m]eaningful review may be possible even absent the explicit step-by-step analysis set out in *Cook* where the ALJ discusses in detail the evidence presented and adequately explains his consideration thereof." *Id*. (citing *Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995)). In this case, the ALJ's discussion of the evidence and explanation of his conclusions in his residual functional capacity assessment indicate that he sufficiently considered whether Plaintiff's back impairment met or equaled a Listing.

As stated above, the ALJ found at step two that degenerative disc disease of the lumbar spine was a severe impairment. (R. at 31.) The ALJ noted that it was severe because it "more than minimally affect[s] [Plaintiff]'s ability to perform basic work activities." (R. at 31.) In his residual

12

functional capacity assessment, the ALJ noted that while Plaintiff's medical record displayed instances of "limited lumbar range of motion, slightly reduced strength in the lower extremities, and positive left-sided straight leg raising," it failed to include evidence of "diminished sensation or reflexes in any area." (R. at 33.) Further, the ALJ reasoned that since not all of 1.04A's abnormalities were present in the record, they were subsequently not found to occur within a single twelve-month period.  (R. at 33.) Therefore, Plaintiff has failed to satisfy all the requirements of Listing 1.04A.

Plaintiff argues that the ALJ failed to discuss her collapsed disc and sciatica, specifically by omitting the word 'sciatica' from his opinion. (Pl.'s Resp. Opp. at 11). Sciatica refers to pain that commonly occurs when a herniated disc compresses part of the nerve, causing inflammation, pain, and numbness in the affected leg.[8] This is congruent with the criteria set forth in Listing 1.04A and encompasses the ALJ's assessment of Plaintiff's degenerative disc disease. Therefore, the Court concludes that ALJ's omission of the word 'sciatica' is harmless as he specifically analyzed Plaintiff's residual functional capacity pursuant to Listing 1.04A. Subsequently, the ALJ's conclusion that Plaintiff's degenerative disc disease did not meet or equal Listing 1.04 is supported by substantial evidence in the record and his analysis was not in error.

### 2.   The ALJ Properly Addressed Plaintiff's Right Shoulder Limitations.

In making his residual functional capacity assessment with regards to Plaintiff's right shoulder pain, the ALJ recognized that Plaintiff had right rotator cuff surgery in October 2014, initially recovered well, but reported subsequent persistent shoulder pain and reduced strength in

---

[8] *See Sciatica: Symptoms and Causes*, MAYO CLINIC (Aug. 1, 2020), https://www.mayoclinic.org/diseases-conditions/sciatica/symptoms-causes/syc-20377435.

her right arm. (R. at 35, 94-95.) Plaintiff testified that she underwent physical therapy for a year, but that it continued to hurt, and she experienced no particular improvement. (R. at 94-95.) Her therapy notes from December 2014 indicate that she was showing "good improvement" in right shoulder range of motion, which was "approaching normal limits in all planes." (R. at 560.) She reinjured her shoulder in January 2015 and sought treatment for pain management. (R. at 544.) By July 2015, her right shoulder continued to show signs of ongoing subacromial and intraarticular inflammation but was notably improved. (R. at 614.)

The ALJ noted that an MRI from June 2017 revealed a tear of the supraspinatus and degenerative changes, which he accounted for when assessing Plaintiff's shoulder limitations. (R. at 35, 1109.) The ALJ explained that the pain and other symptoms associated with Plaintiff's right shoulder impairment limit her to work at the light exertional level, cause her to need to take breaks at times, and further affect her abilities to lift and carry, remain on task, and attend work. (R. at 35.)

In addition to Plaintiff's testimony, the ALJ expressly considered in detail the examination and treatment notes concerning Plaintiff's right shoulder in his residual functional capacity analysis. He found Plaintiff was not as limited as she alleged. (R. at 36.) Specifically, he evaluated the opinions of medical experts and weighed them accordingly against the rest of the medical evidence. (R. at 36-38.) Dr. James Wickham ("Dr. Wickham"), a state agency reviewing physician, noted that Plaintiff can lift and carry twenty pounds occasionally, and ten pounds frequently. (R. at 36.) Although he did not examine Plaintiff, Dr. Wickham opined that the limited range of motion in her shoulder likely makes it difficult for her to perform postural tasks and affects her abilities to reach; however, she can perform certain activities, like typing and cooking, that require good use of the hands. (R. at 37.) This is consistent with the opinion of Dr. Warren Kirby, one of Plaintiff's

14

treating physicians, who remarked that Plaintiff can lift, push, and pull up to twenty pounds. (R. at 37.)

The ALJ also reviewed the opinion of Dr. Jack Hutcheson, a state agency reviewing physician, who noted that Plaintiff can "occasionally push and pull with the right upper extremity and can frequently reach overhead on that side." (R. at 37.) Finally, Plaintiff's treating orthopedist, Dr. Julious Smith, III ("Dr. Smith"), opined that Plaintiff is able to perform light work, although he failed to explain specifically what she is able to do despite her impairments. (R. at 38.) The ALJ found that although Dr. Smith treated Plaintiff many times, his opinions are not consistent with the totality of the record from that time period, which demonstrates that Plaintiff was able to perform a variety of work activities despite the limitations in her right shoulder.[9] (R. at 38.)

At Plaintiff's hearing, the vocational expert testified that a person of the same age, education, and work history as the Plaintiff, with the limitations described, would be able to perform the duties required of a paralegal. Thus, in comparing Plaintiff's residual functional capacity with the physical and mental demands of her work, she is able to perform the work of a paralegal as it is actually and generally performed.

In reviewing the evidence, the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589. Upon review of the medical evidence and the ALJ's decision, the Court

---

[9] The ALJ is not required to give a treating physician's opinion controlling weight and may accord it less weight for a variety of reasons. *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992); *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). In this case, the ALJ discussed in detail his reasons for not accepting all of Dr. Smith's opinions.

finds substantial evidence to support the ALJ's assessment of Plaintiff's right shoulder when he determined her residual functional capacity.

**B. The ALJ Correctly Considered Plaintiff's Subjective Complaints of Pain.**

When assessing the claimant's residual functional capacity in situations where the claimant alleges disabling pain, the ALJ conducts a two-step *Craig* analysis. 20 C.F.R. § 404.1529(b); *see Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). The ALJ first determines whether "objective medical evidence presents a medically determinable impairment that could reasonably be expected to produce the claimant's alleged symptoms." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020) (internal citations and quotations omitted). The ALJ does this by discussing the "claimant's functional limitations discernable from the relevant evidence in the record" and by "examin[ing] the relevant evidence in the record, determin[ing] from that evidence whether the claimant has any functional limitations, and, if any functional limitations are found, factors those limitations into the residual functional capacity assessment." *Deloatch v. Comm'r of Soc. Sec.*, 2009 WL 2475260 (E.D. Va. Aug. 10, 2009) (internal citation omitted). Once the ALJ has found a medically determinable impairment, he then "asses[es] the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled." *Arakas*, 983 F.3d at 95.

At step one of the *Craig* analysis, the ALJ examined Plaintiff's medical history and found that her medically determinable impairments of degenerative joint disease (left hip and lumbar spine) and joint pain (right shoulder and right elbow) could reasonably be expected to produce her

alleged symptoms. (R. at 35.) In conducting step two, the ALJ outlined Plaintiff's medical history and noted objective medical findings that support his conclusion.

In October 2014, Plaintiff had right-sided arthroscopic rotator cuff repair, subacromial decompression, acromioclavicular joint excision, and open biceps tenodesis. (R. at 779-780.)  A June 2017 MRI of her right shoulder showed a full thickness tear of the supraspinatus tendon and degenerative changes. (R. at 1109-10.) Examinations revealed tenderness, a limited range of motion, and positive impingement signs in the right shoulder. (*See e.g.*, R. at 574, 580, 589.) On rare occasions, Plaintiff demonstrated slightly reduced strength in her right arm, (R. at 572, 583) but was at other times found to have full function and strength. (R. at 607, 637, 861.)

The ALJ also considered Plaintiff's right elbow pain. (R. at 35.) An August 2014 MRI revealed partial tearing of the origin of the common extensor tendons. (R. at 791-92.) Examinations showed tenderness and tightness in her right elbow (R. at 536) but also noted full range of motion with flexion and extension, as well as full supination, pronation, and strength. (R. at 538, 607, 614.) Finally, the ALJ examined Plaintiff's history of degenerative joint disease of the left hip and of the lumbar spine. (R. at 35.) The ALJ noted that Plaintiff underwent iliotibial band release surgery in February 2016, with minimal results. (R. at 35.) She also continued to treat for the pain. (R. at 35.) Examinations showed tenderness and a limited range of motion in the hip and low back. (R. at 687, 698, 703, 722.) The ALJ explained that Plaintiff's records indicated that she infrequently displayed slightly reduced strength in the lower extremities. (R. at 35.)

The ALJ also examined Plaintiff's subjective reports of pain. At her medical appointments, Plaintiff described persistent pain in her right shoulder that awakens her several times in the middle of the night. (R. at 108-09.) She described the pain and exhaustion she experiences when driving to the seventh floor of a parking garage, which requires her to turn the steering wheel

17

approximately twenty-two times with her right arm. (R. at 108-09.) She reported little improvement despite regular treatment, including injections, oral medications, and physical therapy. (R. at 93-95.) Plaintiff also testified about her right elbow pain resulting from "tennis and golf elbow." (R. at 108.) She explained that her right shoulder and right elbow pain prevent her from lifting ten pounds, lifting a gallon of milk, carrying groceries, gardening, playing guitar and playing tennis. (R. at 106, 108.)

The ALJ also listened to her testimony about her left hip and leg pain. (R. at 95.) She explained that she initially believed that her iliotibial band caused her to have pain that radiated down her left leg. (R. at 95.) She underwent iliotibial band release surgery but did not receive relief. (R. at 95.) Plaintiff noted that she later learned that her iliotibial band was not causing the pain but was instead resulting from a collapsed L5-S1 disc in her back, which caused sciatica down her left leg. (R. at 96.) She admitted that she did not have back surgery as of the date of the hearing, despite various doctors recommending the procedure after reviewing her lumbar MRI. (R. at 97-98.) After getting a second opinion from an orthopedist, Plaintiff scheduled the lumbar fusion surgery, but canceled for health insurance coverage reasons. (R. at 98, 1345.) Instead, Plaintiff engaged in physical therapy to mitigate her back and leg pain but continued to be "so bothered by the pain [she] could – at any given moment . . . just scream." (R. at 99.) When asked by the ALJ how long she feels she can sit before needing to move positions, Plaintiff responded "10, 20 minutes at the most, although I've been sitting here longer than that now." (R. at 104-05.)

After examining the evidence in the record, the ALJ then assessed the intensity and persistence of the alleged symptoms to determine if Plaintiff was able to work and whether she was disabled. (R. at 23-27); *see Arakas v. Commissioner, Social Security Administration*, 983 F.3d 83, 95 (4th Cir. 2020). The ALJ found that the objective evidence did not fully support Plaintiff's

testimony. (R. at 36.) For instance, Plaintiff's medical records note tenderness and a limited range of motion in the right shoulder and elbow, left hip, and lumbar region, but Plaintiff remains capable of caring for her personal needs, doing chores around the house, preparing meals, driving, and shopping. (R. at 36, 103-04,129.) She reported to her doctor in 2018 that she walks for exercise (R. at 1315.) Moreover, the ALJ found that Plaintiff has been working as a paralegal since February 2018 and can type over one hundred words per minute. (R. at 109, 296.) The ALJ found that the evidence warranted limitations on Plaintiff's ability to work, but that her ability to perform daily tasks, including her work as a paralegal, demonstrated that her pain was not as severe or limiting as she claimed. (R. at 36.)

Plaintiff argues that the ALJ applied an incorrect legal standard in discrediting her subjective complaints based on perceived lack of medical evidence in corroborating them, or so-called "cherry-picking." (Pl.'s Mem. at 2.)  However, Plaintiff has an impairment that produces objective medical evidence. *See* 20 C.F.R. § Pt. 404, Subpt. P, App 1, 1.00(C)(1) (In establishing that a claimant has a musculoskeletal disorder, including disorders of the spine, the Social Security Administration "need[s] objective medical evidence from an acceptable medical source.") The ALJ therefore properly considered both Plaintiff's statements about her pain, which Plaintiff conceded did not currently preclude her from doing her job, and "all the available evidence, including the claimant's medical history, medical signs, and laboratory findings." *Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996); *see also* 20 C.F.R. § 416.929 ("In evaluating the intensity and persistence of . . . symptoms, including pain, [the ALJ] will consider all of the available evidence,

including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the] symptoms affect [the claimant].")

The ALJ's approach accords with the approach to back pain that many courts in the Fourth Circuit have taken. *See Gardner v. Kijakazi*, No. 7:20-CV-124, 2021 WL 3465076 at *6–7 (E.D.N.C. Aug. 6, 2021) (affirming the ALJ's decision that the objective medical evidence did not support the claimant's subjective reports of disabling back pain); *Mark S. v. Saul*, No. 7:19-CV-740, 2021 WL 189149 at *5–8 (W.D. Va. Jan 19, 2021) (holding that the ALJ did not err in finding that the objective medical evidence was inconsistent with the claimant's report of severe back pain that had no clinical indication of a cause); *Allen v. Saul*, No. 3:20-CV-00291, 2021 WL 955575 at *11 (S.D.W. Va. Feb. 23, 2021) (holding that the ALJ correctly considered the claimant's back pain under 20 C.F.R. § 416.929 by examining the claimant's statements about his pain in light of the objective medical evidence). *But see Lafitte v. Saul*, No. 1:20-cv-163, 2021 WL 681102, at *9–10 (M.D.N.C. Feb. 22, 2021) (holding that the ALJ inappropriately increased the claimant's burden of proof by requiring objective medical evidence to substantiate her subjective claims of back pain).

In this case, the ALJ did not err when he examined and considered both objective medical evidence and Plaintiff's subjective complaints of pain.

**C**. **The ALJ Properly Assessed Dr. Higgs's Treatment Records When Determining Plaintiff's Right Shoulder Residual Functional Capacity.**

During the sequential analysis, the ALJ must also analyze any developed medical evidence such as expert evaluations. §§ 404.1512, 404.1527. When the record contains a number of medical opinions, including those from Plaintiff's treating physicians, consultative examiners and other sources, and when those opinions are consistent, the ALJ makes determinations based on that

evidence. *See* § 404.1527(c)(2). If, however, the medical opinions are inconsistent with each other or with other evidence, then the ALJ must evaluate the opinions and assign them differing weight to properly analyze the evidence involved. § 404.1527(c)(2), (d).

Under the regulations, only an "acceptable medical source" may be considered a "treating source." SSR 06-03p, 2006 WL 2263437 (Aug. 9, 2006). [10] Acceptable medical sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability. § 404.1527(a). A "treating source" is a medical source who provides, or has provided, the claimant with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with the claimant. § 404.1527(a)(2).

A treating physician's opinion must be given controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques. § 404.1527(c)(2); *Craig*, 76 F.3d at 590; SSR 96-2p, 1996 WL 374188 (July 2, 1996). However, the regulations do not require the ALJ to accept opinions from a treating physician when the physician's opinion is inconsistent with other evidence or when it is not otherwise well supported. § 404.1527(c)(2), (d)(3), (e). Moreover, if a physician's opinion is "not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. Further, the regulations do not require that the ALJ accept opinions from a treating source in

---

[10] Effective March 27, 2017, the Social Security Administration rescinded SSR 96-2p and 06-3p, instead incorporating some of the Rulings' policies into 20 C.F.R. §§ 404.1527(f), 416.927(f).  82 Fed. Reg. 5844-01, at 5844-45, 5854-55 (Jan. 18, 2017). Plaintiff filed her claim(**s**) on August 10, 2015, before this regulation took effect.  (R. at 278-79.) The Agency does not have the power to engage in retroactive rulemaking. *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power). Because the regulation does not have retroactive effect, SSR 06-03p applies to Plaintiff's claims.

every situation, *e.g.*, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner) or when the opinion otherwise lacks support. § 404.1527(c), (d). Generally, a reviewing court should not disturb an ALJ's decision "absent some indication that the ALJ has 'dredged up specious inconsistencies,' or has failed to give a sufficient reason for the weight afforded a particular opinion." *Dunn*, 607 F. App'x at 267 (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)).

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and (6) any other relevant factors. §404.1527(c).

Dr. Higgs provided orthopedic care to Plaintiff from January 2014 to 2016. (R. at 1205-17.) Plaintiff's records from 2014 indicate that she experienced pain since July 2013 while playing tennis, and that it failed to improve with nonoperative treatment. (R. at 779.) On October 1, 2014, Dr. Higgs surgically performed the following: right shoulder arthroscopic-assisted rotator cuff tear repair of the anterior supraspinatus, superior labral tear repair, subacromial decompression, AC joint excision, and open biceps tenodesis. (R. at 779.) On September 25, 2014, Plaintiff was advised to schedule an appointment for physical therapy following her October 1, 2014 surgery. (R. at 783.) However, at her post-operative follow-up appointment with Dr. Higgs on October 13, 2014, he noted that Plaintiff is "not attending formal [physical therapy] at this point" and that he advised her to schedule and attend physical therapy at least once a week. (R. at 777.)

By December 8, 2014, Dr. Higgs found that Plaintiff's pain levels improved, and that she had full strength in her right shoulder's internal and external rotations. (R. at 766.) Despite this, he

remarked that she continued to stay home from work because she "has to lift heavy books weighing more than 25lbs." (R. at 749, 755, 764, 770, 775.)  He noted that she was supposed to return to work on January 2, 2015 but was "unable to [do] so. (R. at 546.) Consequently, he wrote her a work note through the next visit. (R. at 748.)

     Plaintiff's pain in her shoulder and elbow worsened when she hyperextended her arm during a fall on January 13, 2015. (R. at 749, 751.)  She followed up routinely for her shoulder, and eventually reported left hip pain. (R. at 739.) Dr. Higgs administered a greater trochanteric bursa injection to decrease the inflammation and recommended that she do iliotibial band stretches as well as formal physical therapy to alleviate the pain. (R. at 723, 740.) She again received injections for her left hip and left elbow (R. at 704) although Dr. Higgs continued to note that she exhibited full strength in both. (R. at 687, 703.) On February 10, 2016, Dr. Higgs performed left hip open IT band release surgery. (R. at 886.)  Plaintiff followed up with Dr. Higgs on March 31, 2016 (R. at 889-91.) and May 12, 2016 (R. at 1210), with some improvement, but persistent pain. (R. at 889-91.)

     Plaintiff testified about her treatment with Dr. Higgs during her hearing. (R. at 93-94.) Specifically, she discussed that the decompression surgery that was intended to relieve her impingement syndrome was "not successful," even after attending physical therapy appointments for a year. (R. at 93.) When asked if Dr. Higgs explained what "went wrong," Plaintiff replied "[h]e did not. Unfortunately, Dr. Hicks [sic] ended up leaving the practice." (R. at 93.) She also discussed how Dr. Higgs diagnosed her left leg pain as resulting from the iliotibial band and recommended iliotibial band release surgery. (R. at 95.) Plaintiff told the ALJ "[u]nfortunately, that did not help, either." (R. at 95.) She testified that Dr. Higgs "cost me a lot of money, a lot of scars, and to be perfectly honest, a real, real – a whole lot of pain, whole lot of pain, whole lot of

trouble . . . ." (R. at 95.) Plaintiff stated that after Dr. Higgs left the practice, she learned from another medical provider that the pain in her left leg was caused by a collapsed disc in her back, not her iliotibial band. (R. at 96.) She added that while the cortisone injections helped relieve her symptoms temporarily, she "didn't get anywhere with Dr. Hicks [sic] and [she] wasn't getting anywhere with Ortho Virginia, either." (R. at 97.)

Dr. Higgs administered injections to Plaintiff's elbow, hip, and shoulder, and prescribed a two-day course of prednisone to reduce her inflammation. (R. at 612-15.) He encouraged her to try tennis ball massage for her shoulder and to return to formal physical therapy. (R. at 696, 699.) Dr. Higgs also provided Plaintiff with a tennis elbow brace, although he noted that she had not been wearing it consistently. (R. at 843.) Finally, Dr. Higgs noted that surgery may be recommended for her elbow and hip if Plaintiff continued to experience symptoms. (R. at 843-44.)

Based on the entirety of this evidence, the ALJ properly assessed Plaintiff's residual functional capacity and specifically accounted for Plaintiff's limitations based on objective and subjective findings. The ALJ acknowledged that Plaintiff had some limitations in her ability to perform work-related activities, but not to the extent she alleged. (R. at 34-38.) He accounted for Plaintiff's shoulder limitations by limiting her to light work that required no more than lifting ten pounds occasionally and five pounds frequently with her right arm, required no overhead work with the right arm, and did not require her to lift her right arm more than shoulder height laterally and straight. (R. at 35.) The ALJ also accounted for Dr. Higgs's recommendation for conservative treatment, consisting of medications, injections, and physical therapy. (R. at 36.) Therefore, the ALJ properly analyzed the Dr. Higgs's treatment records with regards to Plaintiff's right shoulder range of motion, reach, strength, and weight restrictions when he determined her residual functional capacity.

24

**V.  CONCLUSION**

For the reasons set forth above, the Court RECOMMENDS that Plaintiff's Memorandum in Support of Plaintiff's Motion for Summary Judgment (ECF No. 27) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 28) be GRANTED and the final decision of the Commissioner be AFFIRMED.

Let the Clerk file a copy of this Report and Recommendation electronically, notify all counsel of record and forward a copy to United States District Judge M. Hannah Lauck.

**NOTICE TO PARTIES**

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

 

 

                                                 /s/ MRC
                                             Mark R. Colombell
                                             United States Magistrate Judge

 

 

Richmond, Virginia
Date: <u>December 1, 2021</u>